## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **BRITTNEY LASHAE GADDISON**, ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action Number** |
| ) | **4:17-cv-01512-AKK** |
| **NANCY A. BERRYHILL,** ) | |
| **Commissioner, SSA,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

Brittney Gaddison brings this action pursuant to Section 405(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the Administrative Law Judge's denial of disability insurance benefits, which has become the final decision of the Commissioner of the Social Security Administration ("SSA"). For the reasons explained below, the court affirms the decision.

## I.    Procedural History

Gaddison filed her application for Disability Insurance Benefits ("DIB") on July 24, 2014 asserting that she suffered from a disability beginning on March 1, 2013, which she later amended to June 27, 2014, due to bipolar disorder. R. 19, 24, 98, 167. After the SSA denied her application, Gaddison requested a formal hearing before an ALJ. R. 95, 107, 118. Ultimately, the ALJ issued a decision

finding that Gaddison was not disabled. R. 37. The Appeals Council affirmed, rendering the ALJ's decision the final decision of the Commissioner. R. 1. Gaddison was 17 years old on the date of her application and 18 years old on the date of the Commissioner's final decision. R. 19, 178. Gaddison filed this action pursuant to § 405(g) of the Act, 42 U.S.C. § 405(g). Doc. 13.

## II.    Standard of Review

First, federal district courts review the SSA's findings of fact under the "substantial evidence" standard of review. 42 U.S.C. §§ 405(g), 1383(c); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is "reasonable and supported by substantial evidence." *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (internal citations omitted). If supported by substantial evidence, the court must affirm the Commissioner's factual findings, even if the evidence preponderates against the Commissioner. *Id.*

Credibility determinations are the province of the ALJ. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005). However, "[t]he testimony of a treating physician must ordinarily be given substantial or considerable weight unless good

cause is shown to the contrary," and the failure of the Secretary "to specify what weight is given to a treating physician's opinion and any reason for giving it no weight" constitutes reversible error. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Courts have found good cause to discount a treating physician's report when it is "not accompanied by objective medical evidence, . . . wholly conclusory," or "inconsistent with [the physician's] own medical records." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991). In contrast to the opinion of a treating physician, "the opinion of a nonexamining physician is entitled to little weight if it is contrary to the opinion of the claimant's treating physician." *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).

Second, federal courts review the SSA's conclusions of law de novo, *see Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987), and "[f]ailure to apply the correct legal standards is grounds not for remand but, for reversal." *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). No presumption attaches to either the ALJ's choice of legal standard or to the ALJ's application of the correct legal standard to the facts. *Id.*

Finally, reviewing courts have the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (emphasis added).

### III.    Statutory and Regulatory Framework

An individual applying for DIB bears the burden of proving that she is disabled.  *Moore*, 405 F.3d at 1211.  To qualify, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) and 416(i)(I)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

For applicants who have attained age 18, determination of disability under the Act requires a five step analysis. See 20 C.F.R. § 404.1520(a)-(f); 20 C.F.R. § 416.920.  Specifically, the Commissioner must determine, in sequence:

(1)    whether the claimant is doing substantial gainful activity;
(2)    whether the claimant has a severe impairment;
(3)    whether the impairment meets or is medically equivalent to one listed by the Secretary;
(4)    whether the claimant is unable to perform his or her past work; and
(5)    whether the claimant is unable to perform any work in the national economy, based on his residual functional capacity.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative answer to any of the above questions leads either to the next question, or, on steps

three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to prior work, the burden shifts to the Secretary to show other work the claimant can do."  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

For applicants under age 18, determination of disability under the Act requires a three step analysis. 20 C.F.R. § 416.924(a).  Specifically, the Commissioner must determine in sequence:

(1) whether the claimant is working;
(2) whether the claimant has a severe impairment; and
(3) whether the impairment meets or equals one listed by the Secretary.

*Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin*., 783 F.3d 847, 850 (11th Cir. 2015).  In determining whether an impairment equals a severe impairment, the ALJ must assess the claimant on six domains:

(1) acquiring and using information;
(2) attending and completing tasks;
(3) interacting and relating with others;
(4) moving about and manipulating objects;
(5) caring for himself; and
(6) health and physical well-being

*Id.* at 851 (citing 20 C.F.R. §§ 416.926a(a), (b)(1), (d)). The claimant must establish that she suffers from an "extreme" limitation in one of the domains, or a "marked" limitation in two of the domains. *Id*. (citing 20 C.F.R. § 416.926a(a)).

In cases where an individual attains age 18 after filing a disability application but before the Commissioner has made a determination or decision on whether the individual is disabled, the Commissioner uses the three step analysis of 20 C.F.R. § 416.924 for the period during which the individual was under age 18, and the five step analysis of 20 C.F.R. § 416.920 for the period starting with the day the individual attains age 18. 20 C.F.R. § 416.924(f).

## IV.  The ALJ's Decision

In performing the three step analysis for the period before Gaddison attained age 18, the ALJ found that Gaddison had not engaged in substantial gainful activity since July 24, 2014, and therefore met Step One.  Doc. 6-3 at 21, 25.  Next, the ALJ found that Gaddison satisfied Step Two because she suffered from a "severe impairment" caused by bipolar disorder.  *Id.* at 25 (citing 20 C.F.R. § 416.924(c)).  Finally, the ALJ found that Gaddison did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the regulations for presumptive disability (i.e. the six domains), or that functionally equaled the listings.  *Id.* at 28-35.  Therefore, the ALJ found that Gaddison was not disabled under the Act prior to attaining age 18. *Id.* at 35.

With respect to the period beginning age 18, Gaddison again satisfied Step One as she had not engaged in substantial gainful activity since July 24, 2014. Doc. 6-3 at 25.  Next, at Step Two, the ALJ found that Gaddison continued to have a severe impairment or combination of impairments, and had not developed any

new impairments since attaining age 18. *Id.* at 35. At Step Three, the ALJ concluded that Gaddison's mental impairment did not meet the severity or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, for depressive, bipolar and related disorders. *Id*. at 25, 36.

Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel,* 800 F.2d at 1030, she proceeded to Step Four, where she determined that Gaddison had no past relevant work and has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except that Gaddison should have infrequent workplace changes, occasional interactions with the public, and instructions that are simple and lack detail. *Id.* at 36-37. The ALJ then proceeded to step five, where based on Gaddison's RFC, age, prior work experience, and the Vocational Expert's ("VE") testimony, the ALJ concluded that Gaddison could perform work that exists in significant numbers in the national economy, including work as a housekeeper, hand packager, and poultry worker. *Id*. at 37-38. Therefore, the ALJ concluded that Gaddison was not disabled under the Act subsequent to attaining age 18. *Id.* at 38.

## V.    Analysis

Gaddison contends that the ALJ erred by failing to (1) make any findings of her credibility; (2) clearly state the grounds to discredit her examining psychologist Dr. David Wilson; and (3) use substantial evidence in finding that her bipolar

disorder failed to rise to a marked level. Doc. 13 at 20-30. Lastly, Gaddison argues that the Appeals Council failed to consider new submissions from the Cherokee-Etowah-DeKalb ("CED") Mental Health Center. *Id.* at 30-33. The court addresses these issues in turn.

### A. Whether ALJ Failed to Properly Discredited Gaddison's Credibility

"The ALJ can make credibility determinations regarding a claimant's subjective complaints and must provide specific reasons for the credibility finding." *Ring v. Berryhill*, 241 F. Supp. 3d 1235, 1245 (N.D. Ala. 2017), *aff'd sub nom.*, *Ring v. Soc. Sec. Admin., Comm'r,* 728 F. App'x 966 (11th Cir. 2018). Although the "credibility determination does not need to cite particular phrases or formulations . . . [,] it cannot merely be a broad rejection that is not enough to enable the reviewing court to conclude that the ALJ considered the medical condition as a whole." *Id.* (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). In reaching a decision, the ALJ must consider "all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how . . . symptoms affect [the claimant]." 20 C.F.R. § 404.1529. However, because a claimant has "voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 416.920(c). Thus

"[a] lack of an explicit credibility finding [only] becomes a ground for remand when credibility is *critical* to the outcome of the case." *Foote*, 67 F.3d at 1560 (emphasis added).

### 1. Subjective Pain Testimony

Gaddison maintains the ALJ failed to properly assess her credibility based on her pain testimony and a school evaluation from guidance counselor Denisse Lumpkin. Doc. 13 at 20-24. To establish a disability via testimony about symptoms, Gaddison must provide "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptom]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptom]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). In assessing Gaddison's symptoms, the ALJ must consider: "the objective medical evidence; [Gaddison's] daily activities; the location, duration, frequency, and intensity of [Gaddison's] symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication taken to relieve the symptoms; treatment, other than medication, for the symptoms; any other measure used to relieve the symptoms; and any other factors concerning functional limitations and restrictions due to the symptoms." *Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 603–04 (11th Cir. 2017) (citing § 404.1529(c)(3)). Although explicit findings as to credibility are not required, "the implication must be obvious to the reviewing court.'" *Dyer*, 395

F.3d at 1210 (quoting *Foote*, 67 F.3d at 1562). Thus, an ALJ must offer a "clearly articulated credibility finding with substantial supporting evidence in the record," *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir.1986).

Turning to the specifics here, after reviewing the record of evidence of Gaddison's treatment history, the ALJ cited the appropriate standard in evaluating "the intensity, persistence, and limiting effects of [Gaddison's] symptoms to determine the extent to which they limit [Gaddison's] ability to do basic work activities." Doc. 6-3 at 26 (citing 20 CFR § 404.1529). As the ALJ noted, "whenever statements about . . . the pain or other symptoms are not substantiated by objective medical records, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.* The ALJ in fact reviewed the entire record, and ultimately found that "the limitations arising from [Gaddison's] bipolar symptoms did not rise to the marked level in any domain." *Id.* Contrary to Gaddison's contention, a review of the record, including objective medical evidence and Gaddison's reported daily activities (*see* 20 C.F.R. § 416.929(c)), supports the ALJ's findings.

Gaddison's subjective testimony about her bipolar symptoms indicated that she suffered from blackouts due to anxiety, emotional triggers, angry outbursts, trouble sleeping, changes in eating patterns, and inability to concentrate. Doc. 13 at 20-24. Although these symptoms may cause some limitations, the ALJ found that the medical record failed to support the extent and severity of the limitations

Gaddison described. With respect to blackouts, for example, the ALJ asked Gaddison to specify when she experiences blackouts and severe anxiety, and Gaddison responded "when [she] is around a lot of people." R. 62. In discrediting this testimony, the ALJ noted that despite anxiety issues Gaddison developed a friendship with a neighbor, had a boyfriend, and told her counselor that she enjoyed working at a fast food restaurant. Doc. 6-3 at 35-36. Moreover, as the ALJ noted, Gaddison's education records indicated that she was able to function in the classroom and her difficulties in expressing herself decreased as she adjusted to her new school. *Id.* at 32; R. 250-256 (Teacher Genia Fry noted that after Gaddison transferred Gaddison experienced no problems or only slight problems in the six domain categories).

Regarding Gaddison's testimony about emotional shifts and lethargy, the ALJ implicitly noted the inconsistency in Gaddison's testimony about when her "depression got so bad that [she] couldn't bring [herself] to get out of bed." R. 65. The ALJ noted that although Gaddison reported difficulties in getting out of bed at her grandmother's home, she was able to attend school on a consistent basis when she lived with her friend's family. *See* R. 65-67 (ALJ during the hearing: "Q: But what I'm trying to understand is why you were able to [get out of bed despite depression] at your friend's house? A: Because I was forced to . . . I was forced to . . . by [friend's mother]"). Gaddison's grandmother also testified that on days where Gaddison struggled to get out of bed, she "just left [Gaddison] alone and

then she finally got up and seemed, you know, that she was – she was getting, getting to herself and she said I'm going to take my medicine." R. 76.   The evidence about Gaddison's actions at her friend's home support the ALJ's decision to discredit this part of Gaddison's testimony.

With respect to Gaddison's contention about her anger outbursts, the ALJ noted that in February 2016 guidance counselor Denisse Lumpkin indicated that Gaddison has a "severe problem with expressing anger appropriately" and a "very serious problem" in handling frustration appropriately.  R. 265-271.  However, the ALJ discredited this testimony, in part, because when the ALJ asked Gaddison whether she had "trouble getting along with the authority figures in your life . . . anyone else at the school," Gaddison responded with "No ma'am." R. 64. Gaddison's medical records also indicate that Gaddison's anger symptoms are not as debilitating as she testified.  As the ALJ pointed out, during a May 2015 CED Mental Health Center visit, Gaddison noted that she experienced "increased symptoms of her bipolar disorder when she went off her medications," but she realized that these symptoms decreased when she is on medications and that she needed to continue taking them.  Doc. 6-3 at 28, 36; R. 517-534.  The ALJ noted also that although Gaddison experienced significant challenges arising from her bipolar disorder, Gaddison also "worked hard to overcome and deal with her depression, anger, and other symptoms by seeking appropriate treatment and using various coping skills and techniques she practiced with her therapist." Doc. 6-3 at

36. Indeed, as explained in detail in Section B, *infra*, regular visits at the CED Mental Health Center indicate that although Gaddison described challenges in meeting her treatment goals to manage anger outbursts, she also noted progress in using coping techniques such as writing in her journal, breathing, and using self-affirmations. *See* R. 517-534.

Finally, although Gaddison complained of an inability to concentrate, the ALJ discredited this testimony because school records indicate that Gaddison made "fairly good grades – B's and C's" while carrying a regular class load. R. 537. *See* R. 272, 274, 296 (Southside High School Transcripts indicating a grade point average around 76 between 2013 and 2016); *see also* R. 205 (Gaddison's grandmother report that "[Gaddison] makes good grades in school but has had hard time paying attention and understanding subjects and sometimes doesn't pay any attention when people are talking to her"). The ALJ also noted that Gaddison was on track to graduate and expressed interests in careers in the Army, as a veterinary technician, or as a pet groomer. Doc. 6-3 at 36.

In short, Gaddison's record, including her assessments[1] and academic performance, belie her subjective complaints. The ALJ properly cited to substantial evidence in the record to discredit Gaddison's testimony about the severity of her bipolar disorder symptoms. Therefore, the decision of the ALJ is

---

[1] In her Self-Assessment Function Report, Gaddison indicated that despite limitations on her social functioning she had no limitations on her daily activities, ability to communicate, and ability to take care of her personal needs and safety. R 182-184.

due to be affirmed. *Lowery v. Soc. Sec. Admin., Comm'r*, 729 F. App'x 801 (11th Cir. 2018) (affirming the ALJ who found "that limitations to which claimant testified were far in excess of those which reasonably would be expected from the objective clinical findings and were not consistent with all of the other evidence of record").

### B. Whether the ALJ Erred by Giving Limited Weight to the Opinion of Dr. David Wilson

Gaddison next challenges the weight the ALJ gave to the opinion of Dr. Wilson, a psychiatrist she visited once at her lawyer's request, contending that the ALJ failed to state with "some measure of clarity" the reasons she gave little weight to Dr. Wilson's opinion. Doc. 13 at 24-28. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s)," including symptoms, diagnosis and prognosis, and a claimant's abilities and restrictions. 20 C.F.R. § 416.927. "An ALJ may not reject an opinion if the claimant went to the doctor at the request of her attorney . . . [and] the purpose for which a report was obtained does not provide a legitimate basis for rejecting it." *Rice v. Comm'r of Soc. Sec.*, 611 F. App'x 665, 666 (11th Cir. 2015). In weighing medical opinions, an ALJ may offer little weight to a physician based on several factors, including: (1) whether the medical opinion is from a treating source who can provide a detailed, longitudinal picture of a claimant's medical impairments; (2) length of treatment; (3) nature and extent

of the treatment relationship; (4) supportability; and (5) consistency. *See* 20 C.F.R. § 404.1527(c)(1)-(2). In contrast to the opinion of a physician who has regularly treated a claimant, a one-time examiner is generally "not entitled to the deference due to a treating medical source." *See Crawford v. Comm'r, Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) ("The ALJ correctly found that, because [the doctor] examined [the claimant] on only one occasion, her opinion was not entitled to great weight.").

Turning to the specifics, Dr. Wilson performed a consultative psychological evaluation where Gaddison shared her experiences with trauma and challenges in controlling her anger. Based on this evaluation, Dr. Wilson opined that although Gaddison is "intelligent with good verbal skills," her "ability to withstanding the pressures of day to day occupational functioning is highly impaired." R. 539. Dr. Wilson also completed a medical source form where he circled "No" on several questions to indicate that Gaddison *cannot* understand or carry out simple instructions, maintain attention for at least two hours, perform activities within a schedule and be punctual, sustain an ordinary routine without special supervision, adjust to routine and infrequent work changes, respond appropriately to criticism from supervisors, interact appropriately with co-workers, and maintain socially appropriate behavior. R. 540. He also opined that Gaddison would experience high absenteeism since he expected her to miss thirty days out of a thirty day period due to her psychological symptoms. *Id.*

The ALJ gave Dr. Wilson's opinion little weight due to its "inconsisten[cy] with [Gaddison's] CED treatment records and with her school records and teacher questionnaires." Doc. 6-3 at 37. In challenging the ALJ's decision, Gaddison merely reiterates Dr. Wilson's findings and notes its consistency with teacher evaluations and her hospitalization for suicidal ideation in December 2015. Doc. 6-3 at 37. These contentions overlook that the overall record supports the ALJ's decision to give little weight to Dr. Wilson's opinion. As an initial matter, a medical source form is conclusory and has limited probative value. Indeed, several courts have criticized "form reports" such as the one Dr. Wilson provided, *see* R. 540, in which a physician merely checks off a list of symptoms without providing an explanation of the evidence that supports her decision. *See Wilkerson ex rel. R.S. v. Astrue,* 2012 WL 2924023, at *3 (N.D. Ala. July 16, 2012) ("form report completed by Dr. Morgan and submitted by [plaintiff]'s counsel consisted of a series of conclusory 'check-offs' devoid of any objective medical findings"); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best[.]"); *Foster v. Astrue,* 410 F. App'x 831, 833 (5th Cir. 2011) (holding use of "questionnaire" format typifies "brief or conclusory" testimony); *Hammersley v. Astrue*, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions").

Here, Dr. Wilson circled answer choices indicating that Gaddison would not be able to function in the workplace. R. 540. Although he summarized Gaddison's medical record in his psychological evaluation, he devoted one paragraph to offer his impressions and failed to explain his conclusion that "[Gaddison's] ability to withstand the pressures of day to day occupational functioning is highly impaired." R. 535-539.

Second, as the ALJ noted, Gaddison's CED Mental Health Center records are clearly at odds with Dr. Wilson's opinion. Despite her fluctuating treatment progress, *all* of her visits with the CED therapist indicate that Gaddison appeared to have a "neat" appearance, "normal" affect, and proper orientation in time, place, person, and situation. R. 83-85; 353-357; 526-535. During the relevant period prior to turning 18, Gaddison's CED records reflect, as the ALJ noted, that she made progress on her treatment goals despite her fluctuating symptoms. For example, in April 2014, she "report[ed] no suicidal or homicidal thoughts in over three years," felt stable on her medications, made fair treatment progress, and continued counseling. R. 353. Next, in July 2014, her Global Assessment of Functioning ("GAF")[2] score was 56 despite little progress on managing her bipolar

---

[2] "A GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning . . . A score between 41 and 50 indicates serious symptoms or 'any serious impairment in social, occupational, or school functioning' . . . A score between 51 and 60 indicates only moderate symptoms or 'moderate difficulty in social, occupational, or school functioning' . . . A score between 61 and 70 indicates only mild symptoms or 'some difficulty in social, occupational, or school functioning.'" *McGriff v.*

symptoms. Gaddison also reported that practice techniques with her therapist were helpful, and she experienced improvements with self-esteem and denied suicidal/homicidal thoughts. R. 533. In September 2014, Gaddison's GAF score had increased to 58, her "bipolar symptoms have improved to three times a month with one episode of depression," and she mentioned making friends and not having depressive symptoms except on the day of the therapy visit. R. 531. In October 2014, Gaddison reported only making "mild" progress toward her goals but added that she was "coping effectively," denied suicidal or homicidal ideation, and was "utilizing journaling and reading as coping methods for mood stabilization." R. 530. Finally, in February 2015, Gaddison made "minimal progress" on her goals but reported that her anger outbursts had declined to only four times a month rather than on a daily basis. R. 355. As the ALJ noted, these records do not support Dr. Wilson's findings that Gaddison is unable to withstand the pressures of a workplace environment.

Moreover, as to Gaddison's contention that the ALJ mistakenly relied on her medical records prior to her turning 18 in assessing Dr. Wilson's opinion, doc. 14 at 25, even after Gaddison turned 18 in April 2015, the record[3] still does not

---

*Comm'r, Soc. Sec. Admin.,* 654 F. App'x 469, 471–72 (11th Cir. 2016) (internal citations omitted).

[3] Gaddison devotes a substantial portion of her brief describing her hospitalizations. The ALJ also noted that the hospital discharge records indicated that Gaddison left stable, that her symptoms increased without medications, and that she can "function reasonably well" when she follows her treatment plan of medications, regular counseling, and coping techniques. Doc. 6-3

support Dr. Wilson's opinion. The post-age 18 records also show that despite fluctuating symptoms, Gaddison continued to make some progress on the same treatment plan. Gaddison's post-age 18 CED Mental Health Center records indicate in chronological order that in May 2015, Gaddison's "symptoms increased due to being out of medication" but she went "back on medication" and "knows she needs medication and will continue to take it." R. 525. Gaddison also indicated during this visit a desire to work on the negative thoughts, and her GAF score was 58. *Id.* Next, in June 2015, Dr. Richard Grant notes that Gaddison had a normal sleep pattern, fair insight and judgment, logical thought process, adequate attention, fair appetite and fair energy, appropriate behavior, and adequate weight. R. 524. In July 2015, Gaddison reported "minimal" progress toward her goals and struggles with controlling anger outbursts, but that she is starting to use coping skills, and that she developed a new friendship with a neighbor who she "is able to visit . . . and talk [to] when she becomes angry." R. 523. When Gaddison returned two months later, although the friendship with her neighbor had ended and she reported minimal progress on her treatment goals, Gaddison's GAF score was 59, she described her long-term goals of becoming a veterinarian, and she was encouraged to use techniques to improve her mood. R. 522. In December 2015,

---

at 29. The court also notes that two of her three hospitalizations occurred prior to Gaddison's alleged onset date of disability – Emergency Walk-In in November 2010, R. 322, and Mountain View Hospitalization in August 2012, R. 92.

Gaddison again made minimal progress toward her goals and she was encouraged to use coping skills to improve her self-esteem and monitor her depressive symptoms. R. 517. Finally, in February 2016, she made no progress on her treatment goals but her therapist recommended that she use "positive coping skills" in order to decrease mood swings, R. 83. To summarize, as the ALJ noted, even the post-age 18 medical entries are inconsistent with Dr. Wilson's opinion that Gaddison's ability to handle the daily pressures of a job is highly impaired. R. 535-539.

In addition to the medical records, Gaddison's school records are also inconsistent with the opinion of Dr. Wilson. For example, Dr. Wilson opined that in a "30 day period" Gaddison would "fail to report to work 30 days due to her psychological symptoms." R. 540. However, school records indicate that in one of her classes Gaddison only missed 20 days in a school year. R. 255. The school records are consistent with Gaddison's grandmother's report that Gaddison misses around one day a week of school, R. 198-206, and Gaddison's admission that she is able to get out of bed and go to school when she is forced to do so. R. 65-67. Gaddison's regular and consistent attendance is reflected in the ALJ's finding that Gaddison consistently earned grades in the average range and is on track to graduate from high school. R. 272, 274, 296.

Finally, the teacher evaluations also undermine Dr. Wilson's opinion, indicating that Gaddison struggled initially after transferring to the school but

made progress during subsequent school years.  Doc. 6-3 at 34.  For example, in October 2012, teacher Cheryl French noted that Gaddison looked "unclean and disheveled" and had a "very serious problem" with respect to cooperation and caring for personal physical needs.  *See also* R. 250, 293.  Although Gaddison cites to this record in support of her disability, the ALJ noted that Gaddison's "alleged onset date in the current case is more than 20 months after [these teacher forms were] completed."  Doc. 6-3 at 28.  The ALJ also noted that teacher evaluations "completed in February 2016, approximately 10 months after the [Gaddison] turned 18" indicate improved functioning — Gaddison had no problems with acquiring and using info, attending and completing tasks, and following rules and obeying adults, but continued to struggle with making and keeping friends as well as handling frustration.  *Id.* at 29 (citing R. 250-271).

Put simply, the ALJ cited multiple reasons to support her decision to give Dr. Wilson's opinion little weight.  Therefore, the ALJ did not commit error or substitute her opinion for that of a medical doctor. *See Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 488 (11th Cir. 2012) (finding that the ALJ did not improperly substitute her own medical opinion for that of a doctor when "substantial evidence supports the weight that she assigned to the opinion").  Accordingly, her decision to give Dr. Wilson's opinion little weight is due to be affirmed.

**C. Whether the ALJ Used Sufficient Evidence in Finding that Gaddison's Bipolar Disorder Did Not Rise to a Marked Level**

Gaddison also alleges that the ALJ failed to fully consider Dr. Wilson and Denisse Lumpkin's opinions in finding Gaddison does not meet Listing 12.04. As explained below, substantial evidence supports the ALJ's decision that Gaddison's impairment did not meet or medically equal any of the six functional domains used for claimants before age 18 and Listing 12.04 used for claimants after age 18.

> 1. *The Substantial Evidence Supports the ALJ's Finding that Gaddison's Impairment Does Not Rise to the Marked Level in Any of the Six Functional Domains.*

For the period before Gaddison turned 18, the ALJ considered whether Gaddison had severe limitations that affected at least two of the six domains evaluating daily functioning or an extreme limitation that affects one domain. *See* 20 C.F.R. § 416.926(a). Upon review of Gaddison's education record, academic performance, and teacher evaluations, the ALJ found that Gaddison (i) had some "academic difficulties and challenges, but at no point has she had any restriction in acquiring and using information rising to the marked level;" (ii) could reasonably be expected to have some distraction and lack of focus but the restrictions in attending and completing tasks does not rise to the marked level; (iii) could interact and relate with others without marked limitations; (iv) had no limitations in terms of moving about and manipulating objects; (v) had significant difficulties in caring for herself but she was on track to graduate from high school and worked with her

therapist to address her mood swings; and (vi) had no limitations in health and physical well-being. Doc. 6-3 at 29-35. Gaddison challenges these findings. For the reasons stated below, the court finds that the ALJ's decision is supported by the substantial evidence.

As an initial matter, in arguing that these findings are in error, Gaddison broadly rejects the ALJ's finding but does not cite the specific domains she contends she meets. It seems Gaddison's contention of error is based solely on one February 2016 evaluation from guidance counselor Denisse Lumpkin who ranked Gaddison as having a serious problem with personal hygiene, expressing anger, and asking permission appropriately, and an obvious problem with following class rules and respecting adult authority. R. 267, 269. Lumpkin's questionnaire offers limited insight because Lumpkin admits that she met with Gaddison "once or twice a month" during her senior and junior years. R. 265. In contrast, two teachers who interacted with Gaddison on a daily basis noted in February 2016 that Gaddison had no problem with acquiring and using information, expressing anger appropriately, and only a slight problem with taking care of personal hygiene. *See* R. 250, 254, 261 (evaluations from Gaddison's government and band teachers). Moreover, teacher questionnaires in general provide limited insight as they do "not explain what distinguishes between slight, obvious, or serious problems or how these designations might correspond to 'less than marked,' 'marked,' or 'extreme' ratings as defined in the regulations." *Beavers v. Soc. Sec. Admin., Comm'r,* 601 F.

App'x 818, 823 (11th Cir. 2015). Indeed, the ALJ cautioned against placing too much reliance on the snapshot description of Gaddison, who had just transferred into Southside High School after attending "22 different schools" and experienced a difficult transition initially. Doc. 6-3 at 26. As the ALJ noted, Gaddison remained on track to graduate and her social behavior improved between her transfer in October 2012 and February 2016 as reflected in her teacher's evaluations. *Id.* *See* R. 250, 254, 261. In short, based on this record, Gaddison has failed to establish that her impairments rise to the marked level in any of the six domains.

### 2. The Substantial Evidence Supports the ALJ's Finding that Gaddison's Impairments Did Not Meet or Medically Equal Listing 12.04.

The ALJ also considered whether Gaddison met the requirements after turning 18 in April 2015. The substantial evidence supports the ALJ's findings that Gaddison's contention that she meets the Listing rests solely on a counselor's evaluation that Gaddison had a serious problem with hygiene, seeking permission, and anger management. *See* doc. 13 at 28. However, the counselor only met with Gaddison twice a month, and the teachers who saw Gaddison on a daily basis noted that her problems with hygiene and anger management were not serious. R. 250, 254, 261.

To determine whether an impairment or combination of impairments meets or medically equals the severity of a listed impairment in 20 C.F.R. Part 404, Subpart B, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, "a

claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson,* 284 F.3d at 1224. Moreover, "to show that his impairment matches a listing, it must meet all of the specified medical criteria[;] [a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). A claimant cannot equal a listing by "showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531. Ultimately, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); *see also* 20 C.F.R. § 416.912(c) (stating "[the claimant] must provide medical evidence showing that [the claimant has] an impairment(s) and how severe it is during the time" the claimant alleges a disability).

To meet Listing 12.04A of 20 C.F.R. 404, Subpart P, Appendix 1, Gaddison must demonstrate medical documentation of bipolar disorder, which is characterized by three or more of the following: "pressured speech, flight of ideas, inflated self-esteem, decreased need for sleep, distractibility, involvement in activities that have a high probability of painful consequences that are not recognized; or increase in goal-directed activity or psychomotor agitation." In

addition to Paragraph A, Gaddison must also satisfy Paragraph B or C.[4]  Paragraph B is met with extreme[5] or marked[6] limitation in two of the following areas of mental functioning: "(i) Understand, remember, or apply information; (ii) Interact with others; (iii) Concentrate, persist, or maintain pace; and (iv) Adapt or manage oneself."  *Id.* at 12.04B.

The ALJ found that Gaddison did not meet Listing 12.04, noting that the medical record only supported that Gaddison's "psychological symptoms result in moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace."  Doc. 6-3 at 35.  The ALJ pointed out also the absence of "decompensation episodes that have lasted for at least [two weeks]."  *Id.* at 34.  To reach this decision, the ALJ reviewed Gaddison's CED Mental Health Center records (as discussed in detail in Section B, *supra*) which indicated that she "remained reasonably stable" with outpatient counseling and medication management.  Doc. 6-3 at 36-37.  The ALJ also reviewed Gaddison's GAF score, which fluctuated in the 50s range and indicated that Gaddison had "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning."

---

[4] Gaddison does not specific whether she meets Paragraph B or Paragraph C.  However, a review of the record indicates that she is attempting to satisfy Paragraph B since there is no evidence that Gaddison has an inability to function outside a highly supportive living arrangement.

[5] "Extreme limitation [indicates that the claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00F(2)(e).

[6] "Marked limitation [indicates that the claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." *Id.* at 12.00F(2)(d).

*Id*.  *See also* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (5th ed. 2013).  Finally, the ALJ noted that although Gaddison was admitted to Mountain View Hospital in December 2015 for anxiety, suicidal thoughts, verbal aggression, and impulsive behaviors, Gaddison's depression symptoms improved at discharge, she had a GAF score of 52, and she resumed CED outpatient counseling and medication management.  *Id.*

### 3. The ALJ Properly Considered Gaddison's Limitations during the VE's Testimony.

Finally, Gaddison maintains that the ALJ failed to fully account for Gaddison's impairments and limitations in the hypothetical the ALJ posted to the VE.  In this respect, Gaddison appears to argue the ALJ's decision is not supported by substantial evidence because the ALJ failed to "consider all of [Gaddison's] severe impairments" during the VE testimony and "show that [Gaddison] could perform other gainful employment in the economy."  *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985).  Indeed, this Circuit has "held that unless there was vocational expert testimony concerning the availability of jobs for a person with the claimant's educational level, work skills and experience and physical limitations, the decision of the ALJ, based significantly on the expert testimony, would be unsupported by substantial evidence." *Id. See also id.* at 1562 ("Where an ALJ relies significantly on the testimony of a VE to find that other jobs exist in the national economy that a Claimant can perform, but fails to include all the

Claimant's limitations in the hypothetical question, the Eleventh Circuit has held that the final decision is not supported by substantial evidence.").

A review of the record shows that the ALJ posed a series of hypotheticals to the VE accounting for Gaddison's RFC.[7] *See, e.g.,* R. 79-81 (ALJ's hypothetical regarding "occasional interaction with the general public and frequent interaction with coworkers and supervisors and would be capable of sustaining attention, concentration for at least two hour blocks of time with normal breaks throughout an eight-hour day," . . . "[if] we continue with that same individual but I now add some additional social restrictions in that the individual should have no interaction with the general public meaning that the job itself would not require interaction with the public, . . . the job requirements itself and occasional interaction with coworkers and supervisors which they're around them throughout the work day but have only occasional conversations and interpersonal interactions"). In light of the ALJ's RFC findings, which are consistent with the medical record, the court cannot conclude, as Gaddison suggests, that the ALJ erred by failing to incorporate all aspects of Dr. Wilson's unsupported opinion in the hypothetical posed to the VE. *See Crawford*, 363 F.3d at 116 (finding that the ALJ was not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported). After all, the ALJ is not required to "pore over every piece of

---

[7] The ALJ determined that Gaddison has the RFC to perform a full range of work at all exertional levels, *except* with limitations on simple instructions, infrequent workplace changes, and *occasional* interactions with the public. Doc. 6-3 at 36.

medical opinion evidence they find persuasive and extract every discrete point of the opinion for inclusion in absurdly lengthy hypotheticals that could easily stretch over several pages of hearing transcript. Nothing in the law requires that result." *Caldwell v. Berryhill*, 2017 WL 694233, at \*5 (M.D. Ala. Feb. 21, 2017).

Moreover, Gaddison also fails to point to what specific limitations the ALJ failed to include in the questions to the VE. In any event, "[t]he hypothetical questions need only include the claimant's impairments, not each and every symptom of the claimant." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1270 (11th Cir.2007) (internal citation omitted). There is no error here because the ALJ found that Gaddison's "moderate difficulties restricted [her] ability to work to the extent that [she] could only comprehend and perform simple routine tasks and interact with others occasionally, and the [ALJ] included those limitations in the hypothetical question." *Kunz v. Comm'r of Soc. Sec.*, 539 F. App'x 996 (11th Cir. 2013).

### D. Whether the Appeals Council Failed to Properly Consider Submitted Evidence

Finally, Gaddison contends that the Appeals Council ("AC") rejected new relevant, material evidence indicating Gaddison's continued treatment for depression. Doc. 13 at 33. Generally, a claimant may present new evidence in support of her application at each stage of the administrative process. *Ingram*, 496 F.3d at 1261 (citing 20 C.F.R. § 404.900(b)). The AC must review a case if the

claimant submits additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and if "there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). *See also Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1309 (11th Cir. 2018) (quoting 20 C.F.R. § 404.970(b), 416.1470(b)) ("Evidence is material if a reasonable possibility exists that the evidence would change the administrative result.").

After the ALJ issued her decision, Gaddison submitted new records to the AC, which she contends undermine the ALJ's decision. As an initial matter, Gaddison merely references the new evidence and argues that the AC's decision was perfunctory adherence, *see* doc. 13 at 31, which is insufficient to "carr[y] her burden to show that these records create a reasonable probability that the ALJ's decision would be changed." *See Caldwell v. Colvin,* 2014 WL 2765820, at *4 (M.D. Ala. June 18, 2014). Moreover, the AC correctly explained why it did not consider the new evidence, i.e. Gaddison's therapy notes from CED Mental Health Center, dated February 1, 2016 to July 20, 2016, stating that the records did "not show a reasonable probability that it would change the outcome of the decision." R. 2 (citing 20 C.F.R. § 404.970(a)(5)). *See also Hargress*, 883 F.3d at 1309 (affirming decision because the new records did "not create a reasonable possibility . . . the evidence would change the administrative result"). Indeed, similar to the medical record from the relevant period, as discussed in Section B,

*supra*, the new therapy notes indicate that Gaddison makes fluctuating progress toward her goals in managing anger outbursts, that her therapist continues to recommend "positive coping skills," and that her appearance, affect, and orientation remained unchanged.  R. 83 – 87.  In fact, the June 2016 Physician's Evaluation, which indicates that Gaddison had a normal sleep pattern, fair insight and judgment, logical thought process, adequate attention and concentration, fair appetite and energy, and appropriate behavior, undercuts Gaddison's contention that the new records would lead to a different result.  R. 85.  Finally, the July 2016 therapy notes, which indicate that Gaddison experienced anger outbursts at home causing the family's landlord to be concerned, are also not helpful as her therapist recommended only that Gaddison use a "diary or journal to write more animated feelings down . . . and encouraged her to use coping skills."  R. 87.  Therefore, because the ALJ has already discussed at length the fluctuating progress that Gaddison has made, nothing in the new records show a "reasonable possibility that the new evidence would change the administrative outcome."  *Hyde v. Bowen,* 823 F.2d 456, 458 (11th Cir. 1987).

Lastly, because the ALJ decided the case through July 25, 2016, the AC correctly declined to review Gaddison's August 2016 record which is not related to the period at issue.  R. 2.  "The AC normally must consider evidence that was not presented to the ALJ when that evidence is new, material, and chronologically relevant. *See Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th

Cir. 2015). Evidence is chronologically relevant if it "relates to the period on or before the date of the [ALJ] hearing decision," 20 C.F.R. §§ 404.970(b), 416.1470(b), and is "material" when it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987). In light of Gaddison's failure to explain why the August 2016 record is chronologically and materially relevant, the court finds that the AC properly declined to review the record. *See Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 783 (11th Cir. 2014) (finding that the AC is not required "to provide a detailed discussion of a claimant's new evidence when denying a request for review").

## VI. Conclusion

Based on the foregoing, the court concludes that the ALJ's determination is supported by substantial evidence, and that the ALJ applied proper legal standards in reaching his decision. Therefore, the Commissioner's final decision is **AFFIRMED.** A separate order in accordance with the memorandum of decision will be entered.

**DONE** the 13th day of March, 2019.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE